IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-2333
_____


RAFIQ A. DANAWALA,

                                        Plaintiff-Appellant,

                          versus

HOUSTON LIGHTING & POWER COMPANY, ET AL.,

                                        Defendants-Appellees.

_____

          Appeal from the United States District Court for
                 the Southern District of Texas
                       (CA H 90 2731)
_____
                       August 24, 1993

Before REAVLEY, DUHÉ AND BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:[1]

        Rafiq A. Danawala sued Houston Lighting & Power (HL&P) and

HL&P Supervisor William Wellborn (collectively defendants),

claiming that Wellborn defamed him by communicating to others

that he falsified a document.  After the jury returned a verdict

in favor of Danawala, the district court granted the defendants'

motion for judgment as a matter of law, and conditionally granted

_____

        [1] Local Rule 47.5 provides:  "The publication of opinions
that have no precedential value and merely decide particular
cases on the basis of well-settled principles of law imposes
needless expense on the public and burdens on the legal
profession."  Pursuant to that Rule, the Court has determined
that this opinion should not be published.

the defendants' alternative motion for a new trial.  Danawala appeals.  We hold that Wellborn's communications were privileged and affirm the district court's judgment.

## I.  BACKGROUND

Danawala worked as an independent contractor with HL&P at the South Texas Nuclear Project (STNP).  He worked as an engineer in the Master Parts List Group (the MPL Group), which was responsible for verifying that any changes in vendors' parts conform with the fit, form, and function of the original parts.

Defendant Wellborn supervised the MPL Group, which consisted mostly of contract personnel.  In 1989, HL&P established a company policy requiring the MPL Group engineers to obtain written verification from the vendor's engineering or quality assurance department that the part change did not affect the fit, form, or function of the original part.[2]

In January 1990, Danawala contacted Ken McKay at vendor Envirex to verify a part's conformity.  McKay, who worked in Envirex's sales and marketing department, returned a written confirmation of the part's conformity.  After completing the verification documents, Danawala forwarded them to his supervisors.  According to Danawala, Kanu Patel, who provided

---

[2]  The policy specifically provides:

2.1.1.  Part number changes that do not impact fit, form[,] function, or material.  These changes shall be considered administrative and shall require a signed letter from the vendor's Engineering or Quality Assurance organization stating that the change is administrative only and does not affect fit, form, function, or material.

2

technical support to the MPL Group engineers, returned the documents to Danawala to inquire about McKay's position at Envirex. Danawala testified that, when he told Kanu Patel that McKay was an engineer, Kanu Patel instructed him to write "engineer" beside McKay's name. After Danawala wrote "engineer" next to McKay's name, he sent the documents back to his supervisors. The documents eventually reached supervisor Wellborn, who discovered that McKay worked in Envirex's sales and marketing department, and was not an engineer.

By failing to get verification from the engineering or quality assurance department, Danawala violated HL&P's company policies. Danawala testified that he simply acted on the mistaken belief that McKay was an engineer capable of verifying a part change. According to Danawala, Envirex's engineering department referred him to McKay.

Wellborn accused Danawala of "falsifying" a company document and terminated Danawala's services with HL&P. Wellborn testified that he notified seven people of Danawala's termination for "falsifying" a document, and then met with the members of the MPL Group to re-emphasize the importance of proper verification.

Danawala sued HL&P and Wellborn for defamation. At trial, HL&P argued that (1) the alleged defamatory statement was true, and (2) Wellborn's communications were privileged because Wellborn published the statement only to HL&P workers who had an interest in the subject matter. The district court submitted issues of truth, privilege, causation, and damages to the jury.

3

The jury returned a verdict in favor of Danawala, finding him entitled to $1.5 million in actual damages and $5 million in punitive damages. The defendants filed a motion for judgment as a matter of law and an alternative motion for new trial. The district court entered judgment as a matter of law in favor of HL&P, holding that: (1) the defamatory statement was true; (2) the defendants did not publish the accusation to anyone other than people reasonably interested in the matter; (3) the defendants did not act with malice; and (4) Danawala failed to prove damages. The district court also granted a conditional new trial in the event that its judgment as a matter of law is overturned on appeal. We will assume that the defendants' communications were defamatory but affirm the judgment as a matter of law on the ground that they were privileged.

## II. ANALYSIS

### A. QUALIFIED (OR CONDITIONAL) PRIVILEGE

In Texas, a communication made on a subject matter in which the person making it has an interest is privileged if made to persons having a corresponding interest or duty. *Bozé v. Branstetter*, 912 F.2d 801, 806 (5th Cir. 1990). This privilege protects statements made by an employer concerning an employee. *Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 (Tex.Civ.App.))Tyler 1980, no writ) ("Accusations against an employee by his employer or another employee, made to a person having a corresponding interest or duty in the matter to which the communication relates, are qualifiedly privileged."). This

4

privilege is "based on a public policy that recognizes the need for the free communication of information to protect business and personal interests. To encourage open communication, it is necessary to afford protection from liability for misinformation given in an appropriate effort to protect or advance the interests involved." *Gaines v. CUNA Mutual Ins. Soc'y*, 681 F.2d 982, 986 (5th Cir. 1982). The privilege is lost, however, if the plaintiff can show that the defendant acted with actual malice. *Id*. Once the underlying factual disputes are resolved, whether a qualified privilege exists is a question of law. *Bozé*, 912 F.2d at 806.

The parties in this case dispute (1) whether Wellborn communicated to persons not having a corresponding interest in the subject matter and (2) whether Wellborn made the statements with malice. The district court submitted these two issues to the jury, and the jury found that Wellborn published the statement to people not reasonably interested in the subject matter and that Wellborn made the statements with malice. In ruling on the judgment as a matter of law, the district court disregarded both of these jury findings. *See* FED. R. CIV. P. 50(b)    *1. Excessive Publication*

Wellborn testified that he told seven people that Danawala had been dismissed for falsifying a document: Roger Garris, Steve Dew, Nitan Patel, Mike Polishak, Steve Veselka, James Mertink, and Claude Grimes. Garris and Dew were Wellborn's supervisors. Nitan Patel was one of Danawala's supervisor and

5

had signed the documents in question. Polishak worked in the MPL Group and was involved in the initial inquiry into the incident. Veselka worked in the MPL Group and assisted Wellborn with administrative duties. Mertink was a supervisor of the Spare Parts Engineering Group, which issued similar documents that had to be approved by Wellborn. Wellborn told Mertink about the "falsification" incident so that Mertink would "watch for those things" before sending documents to him. Grimes was a member of HL&P's human resources department, which has responsibility over HL&P's employees, but not contract workers such as Danawala. Wellborn testified that he called Grimes (a) to verify that the human resources department had no jurisdiction over contract workers and (b) to find out what the proper procedures would have been if Danawala had been an HL&P employee. A few days after Danawala's termination, Grimes was assigned to address Danawala's "speakout" complaint that HL&P had wrongfully terminated him.[3] Wellborn's communications to these seven people fall well within the qualified privilege.

A few days after Danawala's termination, Wellborn met with the members of the MPL Group to re-emphasize the importance of proper verification. Two of the workers who attended the meeting testified that Wellborn discussed "falsification of documents" at

---

[3] The South Texas Project "Speakout" program provides workers a means to communicate concerns relating to the safety or quality of the South Texas Project. The manager of the "Speakout" program referred Danawala's complaint to HL&P's human resources department because the complaint was unrelated to nuclear safety or quality.

the meeting and that they understood that Wellborn was alluding to Danawala. Even if Wellborn alluded to Danawala at the meeting, Wellborn's communications to other MPL Group members, who have an interest in the reasons underlying Danawala's discharge, fall within the scope of the qualified privilege.

At trial, Danawala presented evidence that the falsification accusation spread to people outside of HL&P. Danawala testified that, within a few hours of his termination, he received a call from Rick Massay, a former HL&P worker, who had learned about the falsification accusation. The record does not reveal, however, who told Massay and in what context. Another former HL&P worker, Joe Navillo, learned that Danawala had been terminated for falsifying a document. Navillo testified that he learned of the accusations during a social, non-business-related conversation with one of the HL&P contract workers. On appeal, Danawala argues that these "secondary publications" destroy the defendants' qualified privilege because Wellborn knew or should have known that his accusation would spread to outside parties. We disagree. There is no evidence that Wellborn or any other HL&P supervisor communicated the accusation to persons not reasonably interested in the subject matter. The unauthorized gossip spread by unidentified co-workers of Danawala does not take the defendants outside the scope of their qualified privilege. *Compare Perry Bros. Variety Stores, Inc. v. Layton*, 25 S.W.2d 310, 313 (Tex. 1930) (qualified privilege lost where the store manager charged customer with shoplifting in the

presence of other customers who were in the store open to the general public).[4]

Finally, Danawala presented evidence that, after HL&P released him for falsifying a document, he had difficulty finding long-term employment. But Danawala presented no evidence that any prospective employer ever learned of HL&P's reasons for terminating Danawala. The district court correctly observed that Danawala failed to show a causal connection between his failure to find long-term employment and HL&P's accusations.

Based on the overwhelming evidence at trial, we conclude that the defendants did not lose their qualified privilege through excessive publication. The district court properly disregarded the jury's contrary finding of excessive publication. FED. R. CIV. PRO. 50(b); *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc).

*2. Actual Malice*

The defendants' privilege is lost if Danawala shows that Wellborn published the statement with actual malice. *Seidenstein v. National Medical Enter.*, 769 F.2d 1100, 1103-04 (5th Cir. 1985). To show actual malice, Danawala must show that Wellborn published the statement knowing it to be false, or with a high degree of awareness of its probable falsity. *Id.* at 1104. The focus is on Wellborn's state of mind at the time of publication.

---

[4] *See also Rouly v. Enserch Corp.*, 835 F.2d 1127, 1131-32 (5th Cir. 1988) (applying Louisiana law); *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 395 (5th Cir. 1987) (applying Mississippi law).

*See id.* "Proof of falsity in fact is not enough, nor is proof of a combination of falsehood and general hostility." *Id.*

Danawala contends that the jury could have reasonably inferred actual malice from Wellborn's testimony at trial. Wellborn agreed at trial that the term "falsification" implies an intent to deceive, something more than a mere mistake. Wellborn also acknowledged at trial that Danawala had made a "mistake." Danawala argues on appeal that the jury could have reasonably inferred from these statements that Wellborn knew that his falsification accusation, which implies deceit, was untrue. We disagree.

Wellborn testified that he believed that his accusation of falsification was true or substantially true. He further explained that he believed that Danawala was attempting to deceive HL&P by writing "engineer" on the document instead of following the proper procedures. It is true that Wellborn agreed that Danawala had made a "mistake." But Wellborn elaborated during cross examination that Danawala's "mistake" was writing "engineer" on the document without verifying that McKay was a member of the engineering or quality assurance department. His statement that Danawala made a "mistake" must be read with the rest of his testimony and is in accord with his belief that Danawala was attempting to deceive HL&P by making the document appear like he had complied with the proper procedures. Wellborn's testimony is insufficient to support the jury finding of malice.

9

Danawala asserts that the evidence at trial shows that Wellborn's attitude toward Danawala was "abusive, mean, and vindictive."  The record does contain some evidence (mostly through Danawala's testimony) that Wellborn harbored some ill feelings toward Danawala.  But we agree with the district court that this evidence of animosity is insufficient for a reasonable juror to infer actual malice )) that Wellborn knew the statement was false or had a high degree of awareness of its probable falsity.

**B.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

In addition to defamation, Danawala's complaint raised a claim for intentional infliction of emotional distress.  Prior to trial, the district court dismissed this claim, leaving only Danawala's defamation claim.

To recover for intentional infliction of emotional distress, Danawala must establish that (1) Wellborn acted intentionally or recklessly, (2) Wellborn's conduct was extreme and outrageous, (3) Wellborn's actions caused him emotional distress, and (4) the emotional distress was severe.  *Twyman v, Twyman*, 855 S.W.2d 619, ___ (Tex. 1993).  "Outrageous conduct is that which '[goes] beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Wornick Co. v. Casas*, 1993 WL 233445 at *2, ___  S.W.2d ___, ___ (Tex. 1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d). "'It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so

10

extreme and outrageous as to permit recovery.'" *Id*. (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. h). Without question, the record to support this claim has been fully developed. And it reveals that Wellborn's conduct, as a matter of law, did not "exceed all possible bounds of decency" and was not "utterly intolerable in a civilized community." *See Diamond Shamrock Refining and Mktg. Co. v. Mendez*, 844 S.W.2d 198, 201-02 (Tex. 1992), cited in *Wornick*, 1993 WL 233445, at *3; *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 33-34 (5th Cir. 1992); *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1142-45 (5th Cir. 1991); *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306-07 (5th Cir. 1989). We thus affirm the district court's dismissal of Danawala's claim for intentional infliction of emotional distress.

AFFIRMED.