Jeffrey M. DUFFY, Plaintiff–Appellant,

v.

**LEADING EDGE PRODUCTS, INC., Defendant–Appellee.**

No. 93–2850.

United States Court of Appeals, Fifth Circuit.

Feb. 13, 1995.

310

Gregg Gerlach, L.G. Clinton, Jr., L.G. Clinton Jr., & Assn., Houston, TX, for appellant.

Kathleen H. Graham, William C. Book, Tekell, Book, Matthews & Limmer, Houston, TX, for appellee.

Before GARWOOD, JOLLY and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

■ In this Texas law diversity action for defamation, plaintiff-appellant Jeffrey Duffy (Duffy) alleges that his former employer, defendant-appellee Leading Edge Products, Inc. (Leading Edge), made false allegations of sexual harassment against him which he was as a practical matter compelled to republish to prospective employers. He challenges the district court's order granting Leading Edge's motion for summary judgment. We conclude that Duffy failed to present sufficient evidence of actual malice to overcome

Leading Edge's qualified privilege and therefore affirm.

**Facts and Proceedings Below**

On April 13, 1992, Duffy was fired by Leading Edge for, he was told, sexually harassing two female co-workers. The allegations arose out of two separate incidents. Although there are some discrepancies in the details of these encounters, neither party disputes the basic facts, or that the events actually occurred.

The first incident occurred in September 1991, when Duffy and Leading Edge employee Linda Morse (Morse) were working together at a convention in Dallas, Texas. When the convention ended, Duffy and Morse celebrated at the hotel bar; both eventually became intoxicated. At the end of the evening, Morse followed Duffy to his room to get some aspirin. There, Duffy and Morse kissed briefly but stopped after Morse insisted that she did not feel right about what they were doing. Duffy agreed, and Morse left. She did not tell anyone else about the incident until some months later, when she revealed to Leading Edge manager Margaret Cardamone (Cardamone) that Duffy had "made a pass" at her.

The second incident occurred in the early hours of April 6, 1992. Duffy and other Leading Edge employees, including Jill DiVirgilio (DiVirgillio), were participating in a trade show in Chicago. Earlier in the evening, following a company-sponsored happy hour, Duffy had accompanied DiVirgillio to her hotel room while she dropped off some sodas. Duffy and DiVirgillio had then returned to the hotel lounge but did not see each other for the rest of the evening. Some time around midnight, after DiVirgillio had returned to her room for the evening, Duffy knocked on her door. He told DiVirgillio that he had lost his room key and thought he might have dropped it when he was in the room earlier. DiVirgillio let him in to search for the key. While searching around the bed (on which DiVirgillio was sitting), Duffy made some movement towards DiVirgillio. Duffy says he put his hands on top of hers; DiVirgillio describes him as lunging towards

her as if to get on top of her. DiVirgillio said "no," and Duffy then left the room.

DiVirgillio reported this incident to Cardamone on April 6. Cardamone relayed the story, and the incident involving Morse, to Leading Edge's president, Al Agbay (Agbay). On April 9, Agbay contacted Leading Edge's manager of human resources, Linda DiStefano (DiStefano). Agbay indicated that he wanted Duffy terminated because what he had done was "almost as bad as date rape." He told DiStefano to investigate the incidents.

DiStefano conducted her investigation on Friday, April 10. She spoke to DiVirgillio, Morse, Cardamone, and Duffy by phone concerning the incidents. DiStefano reported that both DiVirgillio and Morse were "visibly upset" when discussing these incidents, that neither woman seemed to be deceiving her, and that neither had any motive to fabricate a story simply to get Duffy in trouble. DiStefano also called the hotel where Duffy and DiVirgillio had stayed in Chicago and asked about the procedure for issuing new room keys. Although Duffy had told DiStefano that he was issued a new key at the front desk after being unable to find his key in DiVirgillio's room, the hotel informed her that no new room keys had been issued on

April 5 or 6.[1] DiStefano concluded that "a pattern of sexual advancement appears evident with Jeff" and recommended that he "be terminated immediately for sexual harrassment [sic]." Duffy was fired on April 13, 1992.

■ Duffy filed suit against Leading Edge on the theory of compelled self-publication defamation.[2] He claims that Leading Edge should be accountable for damages because it was reasonably foreseeable that he would as a practical matter be required to tell prospective employers of the allegedly defamatory reason for his termination.[3] Although he agrees with Leading Edge that it had a qualified privilege to make the statements, which would extend to his republication of them, he contends that Leading Edge lost that privilege because it acted with malice. He attributes malice to Leading Edge on three bases: 1) that DiStefano's investigation was "completely inadequate and reckless"; 2) that DiStefano's investigation was a mere pretext for the decision to fire Duffy; and 3) that Leading Edge, which did not have a sexual harassment policy until after Duffy was terminated, failed to make an adequate determination of what conduct constituted sexual harassment before applying that label

1. Duffy called DiStefano back on Monday, April 13, and changed his story regarding the new key. According to DiStefano's report of the conversation, "Jeff said he took out his license to show the desk attendant for identification. According to Jeff, he said the desk attendant found his key behind his business card (which was in his wallet)? Jeff said that after the desk attendant punched some numbers into his computer he handed Jeff the key to his room, which Jeff said he thought was a new key." DiStefano also noted that in their earlier conversation, Duffy had referred to the desk clerk using the feminine person, whereas in the conversation of April 13, he used the masculine person. DiStefano referred to these discrepancies in Duffy's story, as well as her belief that "[t]he weekend would provide Jeff with ample time to think of another explanation for the incident," as being part of her determination that Duffy should be terminated.

2. The suit was originally filed in a Texas court and was removed to the district court below on the basis of diversity of citizenship.

Duffy amended his complaint in July 1993 after discovery revealed that, in response to con-

cerns that had been expressed about DiVirgillio's absence from the trade show on the morning of April 6, Cardamone told several female employees that DiVirgillio had been involved in a "run-in" with a male co-worker. Word later spread among the employees that Duffy had been involved. Because Duffy does not pursue this aspect of his complaint on appeal, we will not address it.

Duffy does not complain of his firing. Texas is an "employment-at-will" jurisdiction, and absent contract provisions otherwise, an employer, with narrow exceptions, may discharge an employee for any reason or for no reason at all. *See, e.g., Pease v. Pakhoed Corp.*, 980 F.2d 995, 1000 (5th Cir.1993). Duffy does not allege any contractual modification of the otherwise applicable "employment-at-will" doctrine, nor the presence in this case of any exception to it.

3. DiStefano's report notes that Duffy was advised verbally of the reasons for his termination and that "as a favor to Jeff, we should not put his reason for termination in writing ... in order not to jeopardize him, his family, or his career." At oral argument, counsel for Leading Edge acknowledged that a copy of this report may be part of Duffy's personnel file.

to Duffy's conduct. The district court, however, determined that Leading Edge was protected both by its qualified privilege and by the absolute defense of truth.[4] It therefore granted summary judgment for Leading Edge. Duffy now appeals that order.

## Discussion

### I. Standard of Review

 We review a grant of summary judgment *de novo*, using the same standards as the district court. *Hansen v. Continental Insurance Co.*, 940 F.2d 971, 975 (5th Cir. 1991). Summary judgment is appropriate when the record reflects that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue for trial; it may do so by pointing out " 'the absence of evidence supporting the nonmoving party's case.' " *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) (citation omitted). If the moving party meets this burden, the nonmoving party who will have the burden of proof at trial must come forward with summary judgment evidence establishing the existence of a genuine issue; that evidence must be such that if introduced at trial it would suffice to prevent a directed verdict against the nonmovant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Although we consider the evidence in the light most favorable to

the nonmoving party, *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990), *cert. denied*, —— U.S. ——, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993), conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. Qualified Privilege

 Under Texas law, "[a] communication on a subject in which the author or the public has an interest, or with respect to which the author has a duty to perform to another owing a corresponding duty, may constitute a qualified or conditional privilege." *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 630 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). References and accusations made by an employer about an employee to one with a common interest clearly come within this doctrine. *See Pioneer Concrete of Texas, Inc. v. Allen*, 858 S.W.2d 47, 49 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *Schauer v. Memorial Care Systems*, 856 S.W.2d 437, 449 (Tex. App.—Houston [1st Dist.] 1993, no writ). The interest giving rise to the privilege may be that of the publisher of the statement, the recipient, or a third person. *Pioneer Concrete*, 858 S.W.2d at 50.

Neither party disputes that Leading Edge had a qualified privilege to make the allegedly defamatory statement regarding Duffy, a privilege that would extend to any republication by him.[5] The question is whether Lead-

---

4. Because we hold that Duffy's claim fails for lack of proof of actual malice, we do not address the district court's determination that the statements were absolutely privileged as true.

5. We assume *arguendo*, but do not decide, that there was a publication in this case. The parties have argued extensively in their briefs the question whether compelled self-publication defamation is a viable cause of action in Texas. Although the general rule in Texas is that a plaintiff cannot complain of a defamation that he "consented to, authorized, invited or procured," *Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770, 772 (1945), some Texas appellate courts have recognized a limited exception when the plaintiff is compelled to repeat the statement. *Chasewood Construction Co. v. Rico*, 696 S.W.2d 439 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.); *First*

*State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *see also Purcell v. Seguin State,Bank and Trust Co.*, 999 F.2d 950, 959 (5th Cir.1993) (noting that "Texas courts . . . recognize the narrow exception of self-compelled defamation"). Recently, however, another Texas court of appeals refused to recognize this exception. *Doe v. SmithKline Beecham Corp.*, 855 S.W.2d 248, 259 (Tex.App.—Austin 1993), writ granted, No. D–4131 (Tex. Feb. 2, 1994). *Doe* notes that *Restatement (Second) of Torts* § 577, cmt. m, requires that the defamed person be unaware of the defamatory nature of the statement when making the complained of republication. *See also Rico*, at 449 (Reeves, J., dissenting). We consider the question still open in Texas. Because we find that Duffy has failed to sustain his burden with respect to actual malice, however, it is not neces-

ing Edge acted with malice, thereby losing its qualified privilege.

## III. Malice

### A. Definition of Malice

 Our first task is to determine what definition of malice the Texas courts would apply in this case. Under the common law definition, "[m]alice has been defined as ill will, bad or evil motive, or such gross indifference or reckless disregard of the rights of others as to amount to a willful or wanton act." *Marathon Oil Co.*, 682 S.W.2d at 631. "Actual malice," a term of art developed in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, is somewhat different:

"Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. 'Reckless disregard' is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' An error in judgment is not enough." *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex.1989) (citations omitted).

This is a higher standard than common law malice; only clear and convincing proof will support recovery. *Howell v. Hecht*, 821 S.W.2d 627, 630 (Tex.App.—Dallas 1991, writ denied). Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show actual malice. *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 924 (Tex.App.—Corpus Christi 1991, writ dismissed w.o.j.); *Marathon Oil Co.*, 682 S.W.2d at 631.

 Duffy argues that the actual malice standard implicates values unique to the First Amendment and should be confined to cases involving free speech concerns.[6] Texas case law does not support such an interpretation. In *Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex.1970), the defendant, a mercantile credit reporting agency, was sued for defamation for erroneously reporting to its subscribers that the plaintiff had voluntarily filed for bankruptcy. *Id.* at 898. Finding that the defendant enjoyed a qualified privilege because of its contractual duty to report such information to its subscribers, *id.* at 899, the Texas Supreme Court held that

"[t]he *New York Times* definition of actual malice which this Court applied in *El Paso Times* is likewise applicable in the instant case, all three cases being libel suits, all three cases involving publishers' privileges and all three cases requiring malice to overcome the privileges. Insofar as the definition of actual malice is concerned we do not think the instant case involving a conditional privilege is distinguishable from the *New York Times* and *El Paso Times* cases which involve First Amendment Constitutional privileges." *Id.*, 456 S.W.2d at 900–01.

Duffy's assertion that the common law definition of malice should apply to employer-employee cases therefore misses the mark; the appropriate reference point is whether, regardless of who the parties are, a qualified privilege exists. Where it does, actual malice must be shown. *Shearson Lehman Hutton, Inc.*, 806 S.W.2d at 924; *Marathon Oil Co.*, 682 S.W.2d at 631. *See also Ryder Truck Rentals v. Latham*, 593 S.W.2d 334, 341 (Tex. Civ.App.—El Paso 1979, writ ref'd n.r.e.); *Mayfield v. Gleichert*, 484 S.W.2d 619, 627 (Tex.Civ.App.—Tyler 1972, no writ); *Restatement (Second) of Torts* § 600.

### B. Evidence of Malice

 As noted above, federal procedural rules require the entry of summary

---

sary for us to decide whether Texas would recognize a publication on the facts presented here.

**6.** At oral argument, Duffy referred the panel to *Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024 (5th Cir.1975), a case not cited in his brief. He contends that *Vandenburg* supports his position. We find this claim tenuous. Although *Vandenburg* does discuss in some depth the free speech

rationale behind the *New York Times* test, *see id.*, 507 F.2d at 1026, the Court in that case had no occasion to discuss the application of that test to other types of qualified privileges. If it had, the Texas Supreme Court's holding in *Dun and Bradstreet, see* discussion *infra*, would have been controlling.

judgment against the nonmoving party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 321, 106 S.Ct. at 2552. Texas law places the burden of proof at trial with respect to malice on the plaintiff. *Dun and Bradstreet*, 456 S.W.2d at 898. Unlike the Texas courts in summary judgment cases, therefore, we require that Duffy prove malice, rather than that Leading Edge establish absence of malice, to survive Leading Edge's proper summary judgment motion. *Compare Lesbrookton, Inc. v. Jackson*, 796 S.W.2d 276, 286 (Tex.App.—Amarillo 1990, writ denied) (refusing to adopt the *Celotex* standard because "under the Texas summary judgment scheme, the non-movant has no burden to produce proof of an element of his cause of action until that element has been conclusively negated by movant").

■ Duffy has not met his burden in this regard. Under the actual malice standard, a determinative factor is whether the defendant entertained serious doubts as to the truth of the communication; the privilege is not lost if the defendant actually believed the defamatory statement to be true. *Schauer*, 856 S.W.2d at 449. *See also Halbert v. City of Sherman, Texas*, 33 F.3d 526, 530 (5th Cir.1994) (falsity of allegedly defamatory statement is by itself insufficient to show actual malice). Nothing in the record would support a finding that DiStefano did not actually believe Morse and DiVirgillio to be telling the truth. To the contrary, her report reflects that she believed both women to be sincere. Although Duffy presents a fuller account of what transpired, he has not shown that when DiStefano wrote her report she had a high degree of awareness that the underlying facts *as reported to her* were probably false.

Of course, "[p]rofessions of good faith will be unlikely to prove persuasive ... where a story is fabricated," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), but we find no evidence of fabrication here. The record amply supports the conclusion that DiStefano reported, without any substantial or material inaccuracy, what she was told during the investigation. There is no evidence which would support a contrary finding. The facts as described by Morse in her deposition[7] and DiVirgillio in her affidavit[8] support the version of events DiStefano recounts in her report of the investigation.[9]

---

7. During her deposition, Morse had the following exchange with counsel for Leading Edge:

"Q: Okay. Now that you have had an opportunity to read Linda DiStefano's account of her conversation with you involving the incident with Jeffrey Duffy, would you agree that this is what you told Linda DiStefano?
A: Yes. I don't remember exactly what I— exact words that I used by essentially—
....
Q: Okay. Let me clarify one thing. I just want to make sure that the record is clear. You did tell Linda DiStefano when she called you about your incident with Jeffrey Duffy that you told Jeff no, that you—that the kiss was not voluntary and that no further incident took place, is that correct?
A: I did tell her that, yes."

Counsel for Duffy then took over the questioning:

"Q: There have been some other things that have come out in your deposition today that are not at least contained within that written paragraph?
A: That's right.
Q: But nevertheless did you discuss these other things that have come out today with Linda DiStefano?

A: Not at the time that I gave her that statement, no."

8. The affidavit stated, in relevant part,

"I heard a knock on the door and asked who it was. Mr. Duffy responded that he needed to see if he could locate his key. I put my robe on, answered the door, and then sat on the bed while Mr. Duffy searched the room. I recall him picking up a hotel book sitting on the night stand, beside the bed, and asking me if I had read it. Shortly thereafter, he lunged towards me, which caused me to lean back and land on my elbows. Thereafter, I lifted one (1) hand towards him and said, 'No.' Mr. Duffy responded, 'No?' I then suggested that he go to the front desk to get a key."

9. DiStefano's report of her conversation with DiVirgillio reads,

"Jill said she was in bed when at approximately 12:30–1:00 a.m., she heard a knock on her door. Jill said she asked who it was and Jeff said, 'It's me Jeff, I think I left my key in your room.' Jill said she opened the door and let Jeff into the room to look for the key.... Jill said that when Jeff enterred [sic] the room, he

Duffy complains that the investigation was inadequate, but this by itself is clearly not sufficient to show actual malice. *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 406 (Tex.1969); *Shearson Lehman Hutton, Inc.*, 806 S.W.2d at 924; *Marathon Oil Co.*, 682 S.W.2d at 631; *Mayfield*, 484 S.W.2d at 627. Arguably, we might be more persuaded by his insistence that the investigation was a mere pretext for a decision that had already been made to terminate him if there were some evidence of ulterior motive.[10] The record, however, is devoid of any evidence that Leading Edge fabricated these charges or that the decision was based on anything other than these two incidents as reported to DiStefano.[11] Duffy himself admitted in his deposition that he did not believe that Leading Edge had any undisclosed motivation in firing him.[12]

Duffy also claims that actual malice is shown from the fact that neither of these two incidents, either alone or together, would constitute sexual harassment under current Supreme Court interpretations of Title VII. Duffy's interpretation of Title VII may well be correct; we are nevertheless not persuaded by his argument. Although "sexual harassment" has a particular meaning in Title VII litigation, it also has a vernacular meaning that encompasses a far broader range of misconduct than would be actionable

---

went from the doorway to the bureau, to the TV stand, to the bedside table, where no keys were found. Jill said that Jeff asked her if she ever read the Hilton Book that was on the bedside table. Jill said, no. According to Jill, Jeff then walked around to the side of the bed where Jill was sitting and approached her as if to get on top of her. Jill said she put up her hands and said no Jeff. Jeff left the room with no further incident."

The report recounts the following conversation with Morse:

"Linda said when Jeff shut the door, she turned toward him and that is when Jeff kissed her. According to Linda the kiss was not voluntary and that she did not kiss him back or kiss him several times. Linda said she told Jeff no, and no further incident took place."

**10.** Although we recognize that proof of ill will or animosity is not *required* to show actual malice, *Tucker*, 806 S.W.2d at 924, evidence of ulterior motive can often bolster an inference of actual malice. For example, in *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), *cert. denied*, 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985), the plaintiff (Buck) sued his former employer for defamation based, *inter alia*, on comments made by the company's office manager (Eckert) to a "prospective employer" (actually a private detective hired by the plaintiff after he was unable to find a new job). The evidence showed that "the relationship between Eckert and Buck was strained at best." *Id.* at 620. For example, Buck had refused to testify favorably for Eckert in a lawsuit in which Eckert was involved. The evidence also revealed that Eckert, although nominally higher in the office hierarchy than Buck, received only half the salary Buck was paid, and without commissions or profit sharing benefits. *Id.* Despite Eckert's testimony that "he never said anything about Buck that he believed to be untrue," the court upheld the jury finding of actual malice because "the jury was entitled to disbelieve the profession of

good faith. The jury was entitled to believe that Eckert harbored animosity toward Buck...." *Id.* at 621.

**11.** Nor do we think that Agbay's reported comment that Duffy's behavior was "almost as bad as date rape" changes our conclusion. Agbay did not purport to know anything about the events personally, and DiStefano undoubtedly knew this. The comment simply reflects that, based on what Agbay had heard, Agbay's opinion was that Duffy's conduct was "almost as bad as date rape." If anything, this tends to show that Leading Edge did *not* have an *ulterior* motive, and *did* believe what had been reported.

**12.** Duffy's deposition testimony was as follows:

"Q: Well, I'm just saying, did you have any reason to believe that there were other motives in firing you other than the alleged incidents?

A: No, I don't think so.

Q: Okay. Do you think that anyone at Leading Edge was just using that as an excuse to get rid of you?

A: I have no idea.

Q: Okay. And I just want to make sure I understand that it's not your contention that anybody lied about the incidents for the reason that they just wanted to get rid of you for some other reason.

A: That's correct.

. . . .

Q: Do you believe that there was any ill will in getting rid of you at Leading Edge?

A: If you can define this as being ill will, that they originally thought that I had—that I had committed sexual harassment, and then they just needed to investigate it to carry it out to say that they investigated it.

Q: I guess what I'm saying is, do you think that anybody just concocted that for the excuse to fire you?

A: No, I don't think so."

under Title VII.[13] There is *no basis to conclude* that Leading Edge did not believe that Duffy had engaged in sexual harassment in this vernacular sense. Leading Edge did not tell Duffy that he was being fired for violating Title VII or that retaining him would be a violation of Title VII. Moreover, Title VII does not protect employees from being discharged for misconduct that would not be actionable under Title VII. Nor does it restrict employers in the types of actions they can take to remedy behavior that, while it may not create a legal cause of action under Title VII, in their opinion creates an undesirable working environment.

Thus, although Leading Edge may well have been hasty or ultimately mistaken in its *decision, we do not think that the evidence* suffices to allow a finding that it acted with actual malice when it accused Duffy of sexual harassment. Because Duffy failed to meet his burden of proof with respect to this element of his claim, the district court was correct in granting summary judgment for Leading Edge.

### Conclusion

For these reasons, the judgment of the district court is

AFFIRMED.

**13.** We doubt whether sexual harassment in this vernacular sense could even be the subject of a defamation. Such a characterization may well be no more than an opinion, which is not actionable. *See Howell,* 821 S.W.2d at 631.