Steve MAGGARD

v.

**ARCO PRODUCTS COMPANY.**

Civil Action No. G–95–462.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 8, 1996.

Laurence W. Watts, Watts & Associates, Houston, TX, Mark Gaston Lazarz, Valetutto Shellist & Lore, Houston, TX, Marjana Lindsey Roach, Houston, TX, for plaintiff.

George Frederick Rhodes, Donald Templin, Haynes and Boone, Dallas, TX, for defendant.

### ORDER

KENT, District Judge.

In this diversity action, the Plaintiff, a scientist and inventor, asserts claims of defamation and intentional infliction of emotional distress against the Defendant. Now before the Court is the Defendant's Motion for Summary Judgment. For the reasons set forth below, the Motion is hereby **GRANTED IN PART** and **DENIED IN PART.**

### I.

Plaintiff Steve Maggard, an expert in the area of near infrared spectroscopy (NIR), worked as a senior research chemist for Ashland Petroleum Company (Ashland) from 1989 until October 1992. While at Ashland, Maggard received two patents for his work in NIR, and had six patent applications pending. Maggard developed the system that was patented as "Infratrane," which measures octane in gasoline by measuring gasoline's absorption of light in certain high-correlation near infrared bands and mathematically processing the absorption into an octane result during gasoline blending. *See* Second Amended Complaint at paragraphs A1–4; Maggard Deposition at 21.

The American Society for Testing and Materials (ASTM) is a scientific and technical organization formed for "the development of standards on characteristics and performance

of materials, products, systems, and services." ASTM Manual at iv, Welch Deposition, Exhibit D–39. The work of the ASTM is conducted through its members, who share information with each other. The ASTM has different sections devoted to different industries, and competitors in the same industry are generally members in the same ASTM section. Ashland is a member of the ASTM petroleum products section, as is Defendant ARCO Products Company (ARCO), one of Ashland's competitors. *See* Maggard Deposition at 35; William Welch Deposition 8–9, 13.

It is the ASTM's policy to avoid including a patented product or process in one of its standards, unless there are no acceptable alternatives. The ASTM is particularly concerned with proposing and adopting a standard method of measurement that uses a product or process patented by one of its members, because that member could gain a competitive advantage in the industry. *See* ASTM Manual at 36; Welch Deposition at 20–21; Gethner Affidavit at 2–3.

In December 1990, the ASTM formed an NIR Spectroscopy study group, to discuss and develop standard practices and test methods for the use of NIR spectroscopy to measure certain physical properties of petroleum. Members of the study group included Maggard and Linda Lane, an ARCO employee. William Welch, another Ashland employee and chairman of the ASTM Section F, D–2, appointed Maggard as chairman of the NIR study group, a position he held until he resigned in March 1994. Lane succeeded Maggard as chairman of the study group. *See* Maggard deposition at 36, 47; Welch deposition at 49, 52; Minutes of March 1, 1994 Meeting, Welch Deposition, Exhibit D–29. After considering several alternatives, the group elected to study aromatics in gasoline as a test method. *See* Second Amended Complaint at paragraph B5–6; Maggard Deposition at 69.

During the process of selecting a test method to study, Maggard and Welch generally disclosed that Ashland had patents or pending patent applications involving NIR spectroscopy. They specifically informed the group of a patent or pending patent aromatics in diesel, but they did not disclose that Ashland also had a pending patent application involving aromatics in gasoline. *See* Maggard Deposition at 65; Welch Deposition at 25, 54. However, Ashland's work in aromatics in gasoline apparently was widely known in the industry. *See* Plaintiff's Exhibit H, Maggard Deposition at 189. Moreover, in 1992, Maggard hand-delivered to Lane a copy of an article written by Maggard that revealed Ashland had a pending patent application covering aromatics in gasoline. *See* Plaintiff's Exhibit H, Maggard Deposition at 50–51; Plaintiff's Exhibit D, *Fuel Reformation* article. This article is cited in a December 1993 patent application for a blending process invented by Lane and David LeFebre. *See* Plaintiff's Exhibit F, Patent application. In addition, one of Maggard's patents involving aromatics in gasoline is cited in a patent applied for in October 1993 and issued to Lane and Timothy Davidson. *See* Plaintiff's Exhibit G, Patent.

In December 1993, Welch saw preliminary results of round-robin testing performed by study group members. Based on the primary testing method apparently used in the round-robin testing, Welch became concerned that some of the study group members could be infringing on Ashland's patent. On December 3, 1993, Welch approached Lane, who was in charge of the round-robin testing, and informed her of his patent infringement concerns. At that time, Welch specifically informed Lane of Ashland's pending patent application covering aromatics in gasoline.[1] Lane appeared to be surprised and upset by the information given to her by Welch. *See* Welch Deposition at 61–62.

On January 12, 1994, ASTM committee chairman David Smith wrote a letter to Robert Wombles, Ashland's Director of Research, requesting that Ashland allow its methodology to be used in the ASTM standard:

> The members of the ... Study Group on NIR were recently informed that Ashland

1. While the record is not completely clear, it appears that the pending patent application is

the application for the Infratrane system mentioned above, which ultimately received a patent.

Oil Company has one or more patents pending which reportedly are related to the methodology for the determination of the aromatics content of gasoline by near-infrared spectroscopy (NIR). The NIR study group has done cooperative work in the area and is about to issue a standard test method. ASTM D2 [the section supervising the work of the study group] requests that Ashland Oil release to ASTM D2 the rights to this methodology so that the NIR Study Group can proceed to issue the standard test method which they cooperatively developed.

We feel that it is important that this methodology be made available to the petroleum industry and it's [sic] customers as a standard method, since it has the potential to replace less desirable methods for the exchange of product and regulatory purposes.

ASTM Letter, Welch Deposition, Exhibit D-29. In his response, Wombles stated that the Ashland study group members informed the other members at the first meeting that Ashland was active in NIR research and "expected extensive patent coverage for the application of NIR for the determination of properties of petroleum products and on-line monitoring for process control." Wombles Letter, Welch Deposition, Exhibit D-29. Wombles informed Smith that Ashland "will not assert its patents against ASTM members using NIR for laboratory applications. Ashland will enforce its NIR patents and trade secret rights when our NIR methodology is being used for on-line monitoring and process control." *Id.*

At the NIR study group meeting held on March 1, 1994, the issue of the Ashland patent was raised. Members of the study group questioned the general patentability of the NIR process, and discussed the importance of determining what Ashland would consider to be a non-infringing "laboratory process." The members understood that Ashland did not consider the round robin testing to be infringement. While Maggard was not present at this meeting, Welch communicated to the study group Maggard's resignation as chairman. Linda Lane was then nominated as the Group's temporary chair-

man. *See* Minutes of March 1, 1994 Meeting, Welch Deposition, Exhibit D-29.

On April 5, 1994, Welch wrote a letter to the NIR study group members explaining that Ashland's application for the aromatics patent was filed on April 9, 1990, well before the first meeting of the study group in 1991. The letter indicated that Welch informed Lane of the aromatics patent after receiving the round robin results and learning of the primary test methods used in the study. In the letter, Welch stated that "[i]t has come to my attention recently that the patent covers any aromatics analysis used as a primary method to correlate the NIR. I apologize to Linda Lane and members of the group for not having made this clear before, and assure you that it was not intentional." April 5 letter, Welch Deposition, Exhibit D-28. The letter also included copies of Ashland's patents and patent applications.

On April 12, 1994, Lane sent a letter (the April Letter) to the chairman and officers of section D2, the ASTM section supervising the work of the study group. It is this letter which forms the basis of Maggard's claims against ARCO. The relevant portions of the April Letter state as follows:

Recently, in March 1994, one of the NIR Study Group's participating member companies, Ashland Oil, informed D2 Chairman, N. David Smith, that the Study Group's work was in conflict with one of their pending patents. The NIR Study Group members were surprised by this action since no previous statement had been made by Ashland or Steve Maggard, the Ashland employee which chaired the study group, although the patent application has been pending for a number of years. Surprisingly, we now find that Steve Maggard claims to be the "inventor." Members feel that the minutes of their meeting (attached) have clearly discussed or suggested this work toward their collective goal of establishing standards for analytical and associated process NIR methodology.

In a broader context, any hidden agendas of any participating ASTM member to seek a patent position which would bar other members from the fruits of collective

developments and information sharing undermines ASTM and its members' ability to work openly in preparing and defining standards for analytical methodology new to D2 or any other ASTM Study Group.

The NIR Study Group membership is concerned that ASTM's tacit acceptance of, and failure to investigate, Ashland's conduct may undermine the benefit of participation with ASTM. . . .

We recommend the following:

(1) ASTM adopt a policy applicable to all study group members that without ASTM's approval, no members file a patent application or seek other proprietary protection related to ASTM collective work;

(2) ASTM adopt an "ethics code" for members participating in study groups; and

(3) ASTM review Ashland's conduct in the above-described NIR Study Group and report ASTM's findings and recommendations to the NIR Study Group members.

With regard to recommendation # 3, various members of the NIR Study Group are eager to be interviewed by ASTM's D2 Chairman and D2 officers.

*See* Second Amended Complaint, Exhibit A. While the April Letter identifies Linda Lane as its author, the Letter was a collaboration between Lane and Tom Pruitt, who is apparently an ARCO in-house attorney. Lane sent a draft of the Letter to Pruitt, and "this [the April Letter] was the final draft that came out, not looking very much like the original draft." Lane Deposition at 137–38. Although Lane had "misgivings" about the Letter, she signed off on the Letter and sent it, at the direction of Pruitt and John Queb-

rich, another ARCO employee. *Id.* at 138–43. In addition to the D2 chairman and officers, the April Letter was sent to members of the NIR study group. *See* Second Amended Complaint at paragraph D3.

On December 2, 1994, Maggard filed an action in Texas state court against ARCO and Lane,[2] which ARCO timely removed to this Court. Maggard contends the April Letter is libelous because it implies that Maggard lied about the pending patent, that Maggard stole ideas from the study group, and that Maggard is not the inventor of the process described in the patent application. In addition, Maggard contends that Lane slandered him at the March 1994 meeting of the study group and at subsequent meetings, where he alleges that she stated he had failed to inform the group of the pending patent application and that he had stolen the ideas of the study group. Maggard also contends that the conduct of ARCO (through Lane) amounts to intentional infliction of emotional distress.

## II.

In its Motion for Summary Judgment, ARCO contends it is entitled to judgment against Maggard's libel claims because the challenged statements were privileged and made without actual malice. As to Maggard's slander claim, ARCO contends there is no evidence that Lane made the slanderous statements. Finally, ARCO contends that the conduct complained of does not amount to intentional infliction of emotional distress as a matter of law.

### A.

▮ A statement that would otherwise be defamatory[3] may be conditionally or qual-

---

**2.** The state court dismissed Lane as a defendant, concluding it lacked personal jurisdiction over her.

**3.** ARCO rather halfheartedly argues that there can be no liability stemming from the April Letter because the disputed portions of the letter were substantially true. *See* Motion for Summary Judgment at 19–20. ARCO contends the undisputed evidence establishes that the members of the study group in fact were surprised when they learned of Ashland's pending patent covering aromatics in gasoline. Moreover, be-

cause Maggard is listed as the inventor on the aromatics in gasoline patents, all factual assertions in the April Letter are substantially true. This argument, however, completely ignores Maggard's contention that the April Letter implied that he stole and patented under his own name the work of the study group. The Court believes that the April Letter is reasonably capable of the defamatory meaning suggested by Maggard. *See Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 655–56 (Tex.1987) (whether a statement is reasonably capable of a defama-

ifiedly privileged; thus protecting the defendant from liability. "A qualified privilege extends to communications made in good faith on a subject in which the author has an interest or a duty, to another person having a corresponding interest or duty." *Martin v. Southwestern Elec. Power Co.*, 860 S.W.2d 197, 199 (Tex.Ct.App.—Texarkana 1993, writ denied); *see also Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir.1995). A qualified or conditional privilege is recognized "whenever a public or private interest in the availability of correct information is of sufficient importance to require protection of honest communication of misinformation." *Kaplan v. Goodfried*, 497 S.W.2d 101, 105 (Tex.Ct.Civ.App.—Dallas 1973, no writ). The interest giving rise to the privilege may be that of the publisher of the statement, the recipient of the statement, or a third person. *Id.; Pioneer Concrete of Texas, Inc. v. Allen*, 858 S.W.2d 47, 50 (Tex.Ct.App.—Houston [14th Dist.] 1993, writ denied).

■ The facts of this case clearly reveal a substantial common interest between ARCO and the recipients of the April Letter. As members of the ASTM, ARCO and Lane had an interest in ensuring that the work of ASTM committees and study groups is not tainted by ethical questions and in ensuring that testing methods and standards adopted by the ASTM do not inadvertently give a tactical advantage to one of its members. The ASTM members who received the April Letter had corresponding interests in the subject matter of the Letter. Accordingly, the Court concludes that a qualified privilege exists as to the statements contained the

April Letter. *See, e.g., Free v. American Home Assurance Co.*, 902 S.W.2d 51, 55 (Tex.Ct.App.—Houston [1st Dist.] 1995) (whether a qualified privilege exists generally is a question of law).[4]

■ However, the protection afforded by a qualified privilege may be lost if the defendant acted in bad faith or with actual malice. *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898 (Tex.1970); *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 631 (Tex. Ct.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). In Texas, a showing of common law malice is insufficient to overcome a qualified privilege; instead, the plaintiff must establish "actual malice" as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See Dun & Bradstreet*, 456 S.W.2d at 900–01 (conditional privilege can be overcome by showing actual malice as articulated in *New York Times v. Sullivan*); *see also Marathon Oil*, 682 S.W.2d at 631; *Duffy*, 44 F.3d at 313. Thus, to defeat a claim of qualified privilege, the plaintiff must establish that the defamatory statement was made with knowledge that the statement was false, or with reckless disregard for its truth or falsity. *Dun & Bradstreet*, 456 S.W.2d at 901; *Marathon Oil*, 682 S.W.2d at 631; *Duffy*, 44 F.3d at 313. Once a qualified privilege is shown to exist, the plaintiff bears the burden of proving through clear and convincing evidence that the publication was made with actual malice or in bad faith. *See Dun & Bradstreet*, 456 S.W.2d at 898; *Marathon Oil*, 682 S.W.2d at 631; *Duffy*, 44 F.3d at 313.

tory meaning is initially a question of law for the Court; if court determines that a defamatory meaning may exist, the court must allow the jury to determine whether an ordinary reader would perceive the statement as defamatory); *see also Golden Bear Distrib. Sys. of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 948 (5th Cir.1983). Although Maggard and Ashland may have acted improperly by failing to disclose the pending patents, if the jury agrees with Maggard's interpretation of the April Letter, ARCO could not offer truth as a defense, given that the Ashland patent applications were filed before the first meeting of the study group.

4. Maggard contends that a qualified privilege exists only in the context of an employer-employee relationship or where the defendant has a

contractual duty to report the allegedly defamatory information. The Court finds this argument to be utterly unpersuasive and completely inconsistent with the purposes and concerns giving rise to qualified privileges, as repeatedly articulated by Texas courts and the Fifth Circuit. *See, e.g., Gaines v. CUNA Mutual Ins. Soc'y*, 681 F.2d 982, 986 (5th Cir.1982) (qualified privilege in defamation cases is "based on a public policy that recognizes the need for the free communication of information to protect business and personal interests. To encourage open communication, it is necessary to afford protection from liability for misinformation given in an appropriate effort to protect or advance the interests involved.").

The Court concludes that Maggard has presented sufficient evidence from which a jury could reasonably conclude that ARCO acted with actual malice. First, Lane herself testified that she had significant "misgivings" about the April Letter. The jury could reasonably conclude from this statement that Lane had misgivings about the truth of the statements contained the April Letter. While the evidence indicates that Ashland and Maggard did not specifically inform the study group of the aromatics in gasoline patent at the study group's first meeting, there is evidence that at least Lane knew of the pending patent well before the April Letter, given that Lane referred to Maggard's patents and to his magazine article describing the process in her own patent applications filed in October and December 1993. Moreover, in conjunction with his April 5 letter, Welch provided the members of the study group with copies of the patent applications. From this evidence, the jury could reasonably conclude that ARCO knew or should have known that the patent applications were filed before the work of the study group began, and that any insinuation that Maggard stole the ideas of the study group would be false. The Court concludes that this evidence is sufficient to create a question of fact as to whether ARCO acted with actual malice, thus destroying its qualified privilege. Accordingly, as to Maggard's libel claims based on the April Letter, ARCO's Motion for Summary Judgment is hereby **DENIED.**[5]

### B.

As to Maggard's slander claims, ARCO argues there is no evidence that Lane made the slanderous statements about which Maggard complains. Thus, ARCO contends it is entitled to summary judgment against Maggard's slander claims.

In his Second Amended Complaint, Maggard contends Lane made slanderous comments about him at meetings held in March 1994 and October 1994, and that she "continue[s] to make slanderous comments regarding Maggard." *See* Second Amended Complaint at 3–4. Lane denies making the comments attributed to her by Maggard at the March 1994 meeting, and ARCO has presented additional evidence supporting this contention. *See* Lane Affidavit; Welch Deposition at 74–75; Mooney Affidavit; Gethner Affidavit. In his deposition, Maggard admitted that he was not present at the March meeting, and that no one who was present at the meeting told him that Lane made any slanderous comments about him. Maggard testified that his only knowledge of the statements came from one of his attorneys, who told him that Lane made the statements. *See* Maggard Deposition at 148–49. Thus, as to any slander claims flowing from the March 1994 meeting, Maggard has failed to established that any slanderous statements were made.

However, Maggard has presented some evidence that slanderous statements about him were made at meetings in October 1994 and December 1994. *See* Maggard Affidavit at paragraph 11 ("I was in attendance at the October 1994 meeting and Linda Lane made comments impugning my professional reputation") and paragraph 12 ("I was in attendance at the October 1994 study group meeting in Atlanta, Georgia, when Linda Lane again made comments impugning my professional reputation."). While ARCO has presented evidence that Lane made no such comments at the meetings, Maggard's Affidavit creates factual questions and raises credibility issues, thus precluding resolution of the issue by summary judgment. Accordingly, ARCO's Motion for Summary Judgment is hereby **GRANTED** as to Maggard's slander claims based on the March 1994 meeting, but the Motion is hereby **DENIED** as to the slander claims based on Lane's comments at the October and December meetings.

### C.

Under Texas law, to recover for intentional infliction of emotional distress, a

---

5. A communication may also lose its privileged status if it is made to persons outside the interest group. *Calhoun v. Chase Manhattan Bank (U.S.A.), N.A.,* 911 S.W.2d 403, 408 (Tex.Ct.App.—Houston [1st Dist.] 1995); *Martin,* 860 S.W.2d at 199; *see also Perry Bros. Variety Stores v. Layton,* 119 Tex. 130, 25 S.W.2d 310, 313 (1930). Thus, Maggard could also defeat ARCO's qualified privilege claim by establishing that the April Letter was published to those who did not have an interest in the subject matter of the Letter.

plaintiff must establish that (1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the actions caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621–22 (Tex.1993). Liability arises "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 621 (quoting *Restatement (Second) of Torts* § 46 cmt. d). The initial determination of whether the defendant's conduct may reasonably be considered sufficiently extreme and outrageous so as to permit recovery is a question of law for the Court. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1994); *Danawala v. Houston Lighting & Power Co.,* 14 F.3d 251, 256 (5th Cir.1993).

Whether or not ARCO's conduct will support Maggard's defamation claims, it is clear that the conduct is not the type of conduct that will support a claim of intentional infliction of emotional distress under Texas law. *See, e.g., Diamond Shamrock Refining & Mktg. Co. v. Mendez,* 844 S.W.2d 198, 202 (Tex.1992) (firing plaintiff and falsely depicting him in the community as a thief would not support a claim of intentional infliction of emotional distress); *Danawala,* 14 F.3d at 256 (no intentional infliction of emotional distress claim will lie against employer who allegedly defamed the plaintiff by communicating to others that the plaintiff had been terminated for falsifying a document). Thus, the Court agrees with ARCO that, as a matter of law, the conduct about which Maggard complains is insufficient to support his claim of intentional infliction of emotional distress. Accordingly, as to Maggard's claim of intentional infliction of emotional distress, ARCO's Motion for Summary Judgment is hereby **GRANTED.**

### III.

In summary, ARCO's Motion for Summary Judgment is hereby **GRANTED** as to Maggard's slander claims based on Linda Lane's comments at the March 1994 meeting and as to Maggard's claims of intentional infliction of emotional distress. However, ARCO's Motion for Summary Judgment is hereby **DENIED** as to Maggard's libel claims and his slander claims based on Lane's comments at the October 1994 and December 1994 meetings.

**IT IS SO ORDERED.**