# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

─────────────

m 00-30389
Summary Calendar

─────────────

ASODOLLAH HAYATAVOUDI,

Plaintiff-Appellant,

VERSUS

UNIVERSITY OF LOUISIANA SYSTEM BOARD OF TRUSTEES
AND
UNIVERSITY OF SOUTHWESTERN LOUISIANA,

Defendants-Appellees.

─────────────

Appeal from the United States District Court
for the Western District of Louisiana
(97-CV-1846)

─────────────

November 27, 2000

─────────────

Before SMITH, BENAVIDES, and
DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Asodollah Hayatavoudi appeals a summary judgment in favor of the University of Louisiana System Board of Trustees and the University of Southwestern Louisiana[2] (collec

────────

[*](...continued)
R. 47.5.4.

[2] We take judicial notice that the University of Southwestern Louisiana has since changed its name
(continued...)

────────

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR.

tively, the "University") on his title VII claim of employment discrimination. Because we agree with the district court that Hayatavoudi adduced insufficient evidence of discrimination to allow a reasonable jury to find the University liable, we affirm.

I.

Hayatavoudi, an Iranian-American of the Shiite Moslem faith, is a tenured professor in the petroleum engineering department, headed by Herman Reike, who joined the University in 1994.[3] Hayatavoudi has taught at the University since 1980, except for periods of time he spent on sabbatical at Stanford University and on leave because of an injury. With one exception, however, the events relevant to this appeal occurred after 1992.

Hayatavoudi alleges several adverse employment actions.[4] First, he complains that in 1994, his supervising dean, Anthony Ponter, wrongfully denied him a promotion to department head in favor of a "white male who was U.S. born." Second, Hayatavoudi complains about unfavorable performance ratings from supervisors, resulting in lost raises. Third, he objects to the 1994 expiration of his endowed professorship, the revocation of a research stipend, and the alleged failure to pay for consulting work. Fourth, he claims he was subjected to "harsher working conditions" to "discourage him from continuing in his position." Fifth, he alleges that Ponter and Reike "continuously [made] defamatory remarks" about him to students and faculty.

In addition to adverse actions, Hayatavoudi alleges instances of racial harassment. The first is a comment made by a colleagueSSwho has since transferred from the petroleum engineering department to the chemical engineering departmentSSduring the Iran hostage crisis of the early 1980's, in which the colleague called Hayatavoudi "Ayatolla Asodollah." Hayatavoudi also alleges that the same colleague lunged at him during a 1982 meeting, calling him names and referring to him as "dead meat."

Further, Hayatavoudi contends that "toward the middle of the [spring] semester of 1995," Reike sang a "Jewish song" in his presence. Hayatavoudi also alleges that, sometime "during the fall or spring of 1996," Reike told him that, while Reike had been in Saudi Arabia, he had seen Saudis "getting rid of their amadies."[5]

The primary basis for Hayatavoudi's complaint, however, appears to be a March 5, 1996, altercation between him and Reike stemming from a departmental meeting in which Reike notified the faculty that it would not be

---

[2](...continued)
to the University of Louisiana at Lafayette.

[3] We assumeSSwithout decidingSSthat Rieke's position as department head places him in a supervisory position over Hayatavoudi for purposes of title VII analysis.

[4] Because this appeal arises from a summary judgment, we recount the facts in the light most favorable to the non-movant, Hayatavoudi. *See Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). This does not mean, however, that we must give credence to unsupported allegations: "[C]onclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[5] An "amady" appears to be a piece of religious clothing in the Shiite religion.

allowed to utilize the services of the department secretary as much as in the past. Upset, the faculty members walked out of the meeting.

Apparently feeling that Hayatavoudi had led the uprising, Reike confronted him in the hallway after the meeting. Reike, who is white, told Hayatavoudi that he was like "the dogs in the desert, howling as the caravan goes by," which, according to Reike, is a reference to an Arabic proverb. Reike also proclaimed that Hayatavoudi had wasted departmental assets and equated the waste with thievery. The altercation escalated and ended with a physical confrontation during which, according to Hayatavoudi, Reike bumped him and called him an idiot. Hayatavoudi then touched Reike, at which point Reike told Hayatavoudi that he had made a "fatal mistake."[6]

_____

[6] The evidence conflicts regarding the substance of the physical confrontation. Hayatavoudi testified in his deposition that Reike "started coming at [Hayatavoudi] with his stomach in front and started to touch [him]," at which point Hayatavoudi merely asked Reike to calm down. Then, according to Hayatavoudi, Reike proclaimed, "You touched me, you made your fatal mistake." Hayatavoudi maintained a calm demeanor throughout the altercation.

In contrast, Reike contends that he and Hayatavoudi began screaming at one another, with Reike pointing his finger at Hayatavoudi's face. In response, Hayatavoudi shoved Reike, at which point Reike said, "You assaulted me" and told Hayatavoudi he had made a fatal mistake, implying that Hayatavoudi would be punished by the University for the assault. Reike also contends that he did not bump Hayatavoudi, but instead that Hayatavoudi bumped into him. Reike merely placed his own hands behind his back and "was going to take the hit."

(continued...)

II.

In October 1996, Hayatavoudi filed a "charge questionnaire" with the Equal Employment Opportunity Commission ("EEOC") complaining of discrimination on the basis of race, religion, nationality, age, and disability. That charge questionnaire led to an EEOC complaint in May 1997. The EEOC dismissed the complaint in a right-to-sue letter a month later.

Shortly thereafter, Hayatavoudi filed the instant complaint alleging title VII claims on theories of adverse employment action and hostile work environment. After discovery, the University moved for summary judgment, which the district court granted after a hearing, ruling that Hayatavoudi had produced no evidence indicating that Reike's evaluations were motivated by impermissible discrimination, that Hayatavoudi had not produced sufficient evidence that the admittedly hostile environment was the result of discriminatory animus, and that all the other complained-of events occurred more than 300 days before the filing of the EEOC charges and thus were prescribed under title VII.

Hayatavoudi appeals the portion of the summary judgment rationale that concludes that he had produced insufficient evidence of a hostile work environment. He concedes, however, that his "individual claims of adverse

_____

[6](...continued)
Viewing the facts most favorably to Hayatavoudi, Reike bumped into Hayatavoudi, causing the physical confrontation. We find it troubling that, while both parties agree that several observers witnessed the confrontation, neither has produced supporting testimony from any of these witnesses, who could presumably confirm either Hayatavoudi's or Reike's version of the facts.

employment actions are barred by prescription or are independently insufficient to constitute a claim for discrimination. . . . [He] does, however, reference [those] claims . . . as supporting evidence that he was subjected to a hostile environment."

### III.

We review a summary judgment *de novo*, applying the same standard as did that court. *See Waymire v. Harris County*, 86 F.3d 424, 427 (5th Cir. 1996). To survive a motion for summary judgment, the non-moving party must present sufficient evidence to support the elements of its *prima facie* case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986). "Conclusory allegations unsupported by specific facts, however, will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any significant probative evidence tending to support the complaint.'" *National Ass'n of Gov. Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) (modifications in original).

### IV.

To survive summary judgment on a hostile work environment claim, a plaintiff must establish an issue of fact with respect to each of the elements: "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (citing *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995)). To determine whether a work environment is impermissibly abusive, a court must consider all aspects of the discriminatory conduct, including "[its] frequency . . .; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (internal quotation marks omitted).[7]

To violate title VII, discriminatory conduct must be "so severe or pervasive as to alter the conditions of [the victim's] employment." *Id.* at 786 (internal quotation marks omitted, modification in original). Moreover, "an employee's subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." *Vance v. Union Planters Corp.*, 209 F.3d 438, 444 (5th Cir. 2000) (internal quotation marks omitted).

### A.

Hayatavoudi acknowledges the infirmity of any claims related to employment actions taken more than 300 days before the filing of his EEOC questionnaire.[8] Nor does he

---

[7] Although *Faragher* dealt specifically with sexual harassment, the Court drew heavily from precedent involving racial harassment, noting that, "[a]lthough racial and sexual harassment will often take different forms, and standards my [sic] not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." *Faragher*, 524 U.S. at 786-87 & n.1.

[8] Title VII imposes time limits on plaintiffs seeking to recover for discriminatory actions. *See* 42 U.S.C. § 2000e-5(e)(1). When a state or locality provides for an administrative mechanism to address complaints, as is the case here, a title VII plaintiff may not recover for discrimination or harassment occurring more than 300 days before the filing of an EEOC complaint. *See id.*; *Hucka-*
(continued...)

contend that the "continuing violation" theory serves to insulate those claims from the statute of limitations.[9] Instead, he argues that his employment history with the University serves as evidence of the hostile nature of his relationship with that employer.

Although he cites no authority for his position, Hayatavoudi argues that, despite the absence of any allegation of a continuing violation, he may use past events as evidence of a hostile work environment when actual recovery for those events would be barred by limitations. Because we conclude that Hayatavoudi has produced no evidence that the past employment actions were motivated by discriminatory animus and, thus, that they are of no probative value in evaluating his hostile work environment claim, we need not

decide whether they might properly be used as evidence supporting a claim of current hostile environment.

In analyzing each of the alleged adverse actions, we apply the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[10] under which a plaintiff seeking to survive summary judgment must establish a *prima facie* case of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2106 (2000). The defendant may rebut the *prima facie* case by producing a legitimate, non-discriminatory justification for the employment action; upon such a showing, the *McDonnell Douglas* framework disappears, and the remaining issue is "discrimination *vel non*." *Id.* (internal quotation marks omitted).

To survive summary judgment, however, the plaintiff may still show that the defendant's proffered justification is mere pretext. *See id.* A showing of pretext may, on its own, allow a trier of fact to infer discriminatory motive. *See id.* at 2108.

The first employment action Hayatavoudi describes is Ponter's failure to consider him for appointment to department head. Hayatavoudi cites Ponter's deposition testimony that in choosing a department head, Ponter preferred

---

[8](...continued)
*bay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998).

Because neither party addresses the issue of whether the filing of a "charge questionnaire" with the EEOC tolls the statute of limitations under title VII, we assume, *arguendo*, that it does. Title VII's time limits are not jurisdictional and therefore may be waived by a party for whom they would otherwise serve as a defense. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Thus, to the extent that the University may have been able to assert a defense based on the fact that Hayatavoudi's EEOC complaint was not filed until June 1997, it has waived that defense by failing to assert it on appeal.

[9] *See, e.g.*, *Webb v. Cardiothoracic Surgery Assocs., P.A.*, 139 F.3d 532, 537 (5th Cir. 1998) ("Application of [the continuing violation" theory relieves a Title VII plaintiff from the burdens of proving that the entire violation occurred within the actionable period provided the plaintiff can show a series of related acts, one or more of which falls within the limitations period.").

[10] Normally, the *McDonnell Douglas* framework is used in analyzing claims of discrimination based on adverse employment action. As discussed *supra*, Hayatavoudi admits that he has no viable claims for discriminatory employment actions. Because, however, he contends that past employment actions are evidence of a hostile work environment, we must evaluate those actions for discriminatory animus. The *McDonnell Douglas* framework is an appropriate device by which to do so.

"American born" citizens to those of foreign nationality. Standing alone, such a statement might be indicative of discriminatory animus; in the deposition, however, Ponter also indicated his basis for the statement, that under his view of United States immigration law, "if you have a U.S. citizen and a foreigner with exactly the same qualification, you take the U.S. citizen." Viewed in context, Ponter's assertion represents merely an imprecise formulation of his (accurate) view of the University's rights under federal immigration law.[11]

More importantly, the University has articulated a legitimate, non-discriminatory justification for its failure to consider Hayatavoudi for the position. Gary Marota, the University's vice president for academic affairs, indicated that he had instructed Ponter to look for a department head from outside the department, given the fact that every member of the department, including Hayatavoudi, had in the past served as department head, each "with great disaster." Given this legitimate justification for hiring Reike, an outsider, instead of Hayatavoudi, and the inability of Hayatavoudi to show that the justification is pretext, we cannot conclude that the University's choice of department head results from any racial, ethnic, or religious animus.

Hayatavoudi complains about his unfavorable performance evaluations. He contends that the unfavorable scores and comments included in his evaluations are the result of discriminatory animus and are not indicative of his actual performance. The record reflects that, while Hayatavoudi's overall scores are generally unfavorableSShe has received a rating of four every year since Reike began the evaluation process, except for 1997, when he received a "three-star"[12]SSthey are not substantially worse than those of any other member of the department, with the exception of Ali Ghalambour, an Iranian professor who consistently receives ratings of one and two. Notably, Hayatavoudi has failed to show that he was treated differently, with respect to his overall scores, from any non-minority member of the department.[13]

More than the overall scores, Hayatavoudi complains about his ratings in the area of research, where he has received consistently low scores.[14] The record reflects, however, that the unfavorable evaluations were always accompanied by detailed explanations, providing legitimate justification for the ratings. Hayatavoudi often failed to sign the evaluations, because he felt they were unfair,

---

[11] Ponter's exposition of the law on this point is correct: "[I]t is not an unfair immigration-related employment practice for a person or other entity to prefer to hire, recruit or refer an individual who is a citizen or national of the United States over another individual who is an alien if the two individuals are equally qualified." 8 U.S.C. § 1324b(a)(4).

[12] The faculty rating system allows an evaluatorSSin this case, ReikeSSto assign ratings from one to four. One is the highest rating a professor can attain under the system, while four indicates unsatisfactory performance. Three indicates satisfactory performance, while "three-star" indicates performance at a level slightly higher than three.

[13] Although the petroleum engineering department had only one non-minority member, that professor consistently received ratings of four.

[14] It is undisputed that Hayatavoudi received consistently high ratings from Reike in his teaching evaluations.

and he made numerous complaints to University administration about the evaluations; there is, however, no evidence in the record that those complaints alleged any racial, ethnic, or religious motivation for the evaluations. Moreover, the record reflects that Hayatavoudi failed to take advantage of invitations to discuss his evaluations with the University administration.

Regarding the substance of the evaluationsSSthat he failed to meet standards for scholarly productionSSHayatavoudi argues that he has produced fifteen publications, one patent, and four pending patents. In his deposition, however, he could point to only one publication, four abstracts, and no proposals during the first eight months of 1998 and two or three abstracts, resulting in two publications, during 1997. One of the 1997 publications discussed his sole patent, which appears to cover an invention made during the course of an independent contract with an outside company, not within the scope of his employment at the University.

Although Hayatavoudi remembers publishing something in 1996, he cannot remember the substance of that article. Reike stated, in his deposition, that he instructed Hayatavoudi to produce at least one research proposal per semester and that Hayatavoudi had failed to comply with that instruction; Hayatavoudi does not dispute this contention. To summarize, other than a vague statement regarding the number of publications he has produced throughout his career, Hayatavoudi can point to no evidence showing that his production deserves a rating higher than four. On this record, there is nothing to show that the University's justification for Hayatavoudi's low evaluationsSSthat he failed to produce enough publications or proposalsSSis mere

pretext.

Hayatavoudi next takes issue with what he terms the "revocation" of his endowed professorship. Hayatavoudi contends that the revocation is the result of discrimination. The University admits that Hayatavoudi lost the professorship but contends that the professorship is awarded on renewable three-year terms. Because Hayatavoudi failed to re-apply for the professorship, it expired.

Hayatavoudi does not dispute that he failed to reapply for the professorship but seems to contend that he did not need to reapply. Notably, he has not produced any evidence that the expiration of his professorship was related to racial, ethnic, or religious animus or that his failure to reapply is merely pretext for discrimination.

Hayatavoudi also complains about a research stipend that was revoked when his research was not approved. Although he alleges that the research was pre-approved and that the disapproval was therefore improper, he provides no evidence supporting the allegation. Such a bare allegation is not probative with respect to the issue of whether the stipend revocation was motivated by discrimination. Neither the expiration of Hayatavoudi's professorship nor the revocation of his research stipend evidences any racial, ethnic, or religious animus.

Hayatavoudi alleges that in an attempt to force him to resign, the University subjected him to "harsher working conditions" than those faced by other faculty members. The only support we can find in the record for this allegation is the assertion in his affidavit that "[h]e was never provided a safe environment to teach [sic] after his injury and did have to

7

teach in his dormitory for a period of time."[15]

The record reflects that Hayatavoudi was told repeatedly that he was not allowed to teach from his dormitory room because it was against University policy, yet he continued the practice. Other than his testimony that his back injury and urinary tract surgery rendered him unable to teach in a classroom, Hayatavoudi fails to support, with facts in the record, his allegation of unsafe environment. More importantly, he fails to establish any connection between his allegations and any racial, ethnic, or religious animus. As we have said, unsupported allegations are not probative evidence of hostile work environment.

Finally, Hayatavoudi complains that he was "subjected to continuous defamatory remarks to his peers and students by Dean Ponter and Dr. Herman Reike, such as stating 'you are no research professor' and 'your work is no good.'" Hayatavoudi has failed, however, to produce the testimony of any peers or students supporting these allegations.

Once again, unsupported allegations provide no evidence of any racial, ethnic, or religious animus on the part of Reike or Ponter. Viewing the evidence in the light most favorable to Hayatavoudi, we cannot conclude that any of the actions of which Hayatavoudi complains provide evidence that he was subjected to discrimination or a hostile work environment.

### B.
Having disposed of all of Hayatavoudi's "supporting" allegations, we now turn to the allegations that directly undergird his hostile work environment claim. The first of those allegations is the "Jewish song." We need not decide the perverse issue of whether the mere singing of a Jewish song around a Moslem constitutes religious harassment, because Hayatavoudi's unsupported allegation cannot form the basis for relief.

Nowhere in the record do we find support for the allegation; in fact, during his deposition, Hayatavoudi could not even state with any degree of specificity when the event occurred or who may have witnessed it. Likewise, accepting as true Hayatavoudi's allegation that Reike told him that the Saudis were "getting rid of their amadies," we fail to see how the recounting of an observed phenomenon, without more, can possibly be considered harassing conduct. We therefore cannot conclude that either of these events is probative of the ultimate fact of racial, ethnic, or religious harassment.

The events that occurred on and after March 5, 1996, form the primary basis for Hayatavoudi's hostile work environment claim.[16] In evaluating whether these events constitute "discriminatory conduct [that] was severe or pervasive enough to create an

[15] Because neither the pleadings nor Hayatavoudi's brief describes the harsh conditions, we are left to speculate as to what he may have been referring.

[16] Hayatavoudi also asks us to consider, in evaluating his hostile work environment claim, the "Ayatollah Assodollah" comment and the confrontation between himself and Farshad. Those events occurred in 1982, and Hayatavoudi cannot show that any discriminatory conduct has occurred in the intervening period. Moreover, Farshad, the antagonist in each of those events, no longer works in the petroleum engineering department. On these facts, we cannot conclude that either event is probative of pervasive racial, ethnic, or religious hostility within title VII's limitation period.

8

objectively hostile or abusive work environment," *Walker*, 214 F.3d at 625 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993)), we must be mindful that "Title VII is not a general civility code for the American workplace . . . ." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) (single-judge opinion) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Indeed, "conduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher*, 524 U.S. at 788. The proper title VII analysis "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (internal quotation marks omitted) (discussing, in the context of a sexual harassment suit, the "demanding" standard a court must use to properly judge hostility).

Having decided that neither the University's employment decisions nor the two prior interactions between Reike and Hayatavoudi provide probative evidence with respect to the ultimate issue in this caseSSwhether racial, ethnic, or religious animus contributed to the admittedly hostile atmosphere in the petroleum engineering departmentSSwe now evaluate the March 1996 altercation. Viewed most favorably to Hayatavoudi, that incident consists of the following: (1) Reike's "dog in the desert" comment to Hayatavoudi; (2) the chest "butting" between Reike and Hayatavoudi; (3) Reike's "idiot" insult; and (4) Reike's allegation that Hayatavoudi's wastefulness amounts to thievery. Because all the events occurred during one altercation, the allegedly discriminatory conduct plainly was not pervasive. The sole remaining issue, therefore, is whether any of the eventsSSor their confluenceSSwas severe enough to form a basis for a Title VII claim.

Assuming, *arguendo*, that Reike's "dog in the desert" comment was motivated by racial animus,[17] that comment alone does not rise to a level sufficiently severe to support a title VII claim. We have stated that "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not constitute actionable harassment under title VII. *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), *quoted in Faragher*, 524 U.S. at 787.

Coupled with the physical "bump," however, Reike's comment becomes a closer call.[18] Nonetheless, in looking at "all the circumstances," as required by *Faragher*, *id.*, the altercation did not constitute harassment severe enough to alter the conditions of employment. There appear to have been no negative ramifications resulting from the incident; indeed, Hayatavoudi concedes that the atmosphere in the department has been relatively placid since then.[19] In summary, a

---

[17] This is not to say that such an assumption is dictated by the facts of this case. Indeed, it seems far more plausible to conclude that Reike, upset over the faculty's interruption of the department meeting, simply confronted Hayatavoudi, whom Reike (correctly or incorrectly) assumed to be the leader of the mutiny, with an allegory he had learned during his extensive travels to Moslem countries.

[18] As we note *supra*, one of the factors to consider in evaluating discriminatory conduct is "whether it is physically threatening or humiliating, or a mere offensive utterance . . . ." *Faragher*, 524 U.S. at 787-88.

[19] In fact, Marota and Ponter testified that Reike was informally reprimanded after the incident, and (continued...)

9

primarily verbal altercation, during which nothing more physically threatening than chest "butting" occurred, is not sufficiently severe to justify relief under title VII.

The fact that Reike called Hayatavoudi an idiot during the altercation does nothing to alter our analysis. During a heated exchange, it is not unusual for combatants to exchange such unpleasantries; that comment utterly fails to provide any probative evidence of racial animus. Likewise, Reike's assertion that Hayatavoudi's wastefulness is tantamount to thievery is nothing more than an angry statement made during an altercation; it displays no racial animus.[20]

## V.

Without a doubt, the environment in the petroleum engineering department was far from harmonious. To the extent that the strife in that department exceeded the infighting typical of academic settings, however, we cannot conclude that racial animus caused the aberration. With respect to each of the employment actions Hayatavoudi mentions, the University has produced legitimate, non-discriminatory justifications to counter every colorable allegation. Even after extensive discovery, Hayatavoudi cannot show that any of the asserted justifications is pretext.

With respect to the strained relationship between Reike and Hayatavoudi, the only allegation even remotely indicative of racial animus is the altercation in March 1996. That event cannot be described as severe enough to alter Hayatavoudi's conditions of employment, however, and therefore cannot on its own support a title VII claim.

The district court aptly summed up this case when, in its oral ruling granting summary judgment, it stated that "[t]hese two guys just didn't get along" but that "I don't think . . . a jury could find that it had anything to do with race, religion, or national origin." Hayatavoudi has failed to establish a material issue of fact with respect to each of the elements of his *prima facie* claim. In particular, he cannot establish a fact issue with respect to whether the University's conduct was severe or pervasive enough to alter the conditions of his employment. Viewing all the supportable allegations in the light most favorable to Hayatavoudi, we conclude that the district court properly granted summary judgment.

AFFIRMED.

---

[19](...continued)
Hayatavoudi concedes that there have been no other incidents since the March 1996 incident and speculates that "somebody may have talked to [Reike]."

[20] Moreover, Reike contendsSSand Hayatavoudi does not disputeSSthat Reike's statement resulted from a conversation with other faculty members in which they described Hayatavoudi's purported wastefulness.

10