United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 29, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 04-30554

AMANDA DUTTON,

Plaintiff-Appellant,

versus

UNIVERSITY HEALTHCARE SYSTEM, L.L.C.,
d/b/a, TULANE UNIVERSITY HOSPITAL AND CLINIC,

Defendant-Appellee.

Appeals from the United States District Court
for the Eastern District of Louisiana
No. 03-2084 D(4)

Before KING, Chief Judge,  BENAVIDES, and STEWART, Circuit Judges.

PER CURIAM:[*]

Amanda Dutton ("Dutton") appeals from the district court's grant of summary judgment in

favor of her former employer, University Healthcare System, doing business as Tulane University

Hospital and Clinic ("Tulane"), which dismissed her claims under the Family Medical Leave Act

---

[*]Pursuant to 5ᵀᴴ Cɪʀ. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ Cɪʀ. R.
47.5.4.

("FMLA"), 29 U.S.C. §2601 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. We affirm the grant of summary judgment for essentially the same reasons as the district court.

## BACKGROUND

Prior to her termination, Dutton worked as a supervisor in Tulane's Business Services Office ("BSO") from March 1999 to December 2001. Dutton was initially responsible for non-governmental billing and collections; her immediate supervisor was Mike Lane ("Lane"), Director of the BSO. The BSO reorganized in 2000, centralizing its billing and collections function at one location in Texas. The district court determined that Tulane gave Dutton and her colleagues notice that, as a result of the reorganization, their department would be closing.

In that same year, Lane was replaced by Mary Failla ("Failla") as Dutton's immediate supervisor. As part of Failla's own reorganization, Dutton lost supervisory authority over non-governmental billing, but kept supervision over non-governmental collections. To assist and educate personnel in the business office, Failla hired an outside consulting firm, Coast to Coast Consulting, Inc. ("Coast Consulting"). From October 2000 until mid-December 2000, Tulane alleges that Coast Consulting evaluated ongoing problems in the department, including problems with Dutton's performance and with her staff. The district court determined that despite Failla's efforts to improve Dutton's performance, Failla observed and documented continued problems with Dutton and her staff in the area of collections and collection follow-ups.

In June of 2001, Dutton requested and was granted leave under the FMLA. Dutton's leave extended from June 20, 2001 to August 20, 2001, while she underwent removal of a fibroid tumor on her uterus. During Dutton's leave, Tulane contracted services for part of her duties to Advanced

2

Receivables Strategy, Inc. ("ARS"), a company specializing in billing and collections. ARS' task was to perform many of Dutton's duties, offer suggestions on how to improve her staff's performance, and to train Dutton's staff to perform more efficiently. Tulane alleges that during Dutton's absences, two ARS employees, Elizabeth Mirck and Carlo Ianni, discovered serious deficiencies in Dutton's performances in the area of collections, including over 1000 of Dutton's accounts had not been worked-up and that Dutton had a backlog of mail that had never been opened. The ARS employees conveyed to Failla a list of violations by Dutton.[1] On August 20, 2001, Failla issued Dutton a written warning, listing all the violations communicated by the ARS employees. On August 21, 2001, the day Dutton returned from leave, Tulane alleges Failla presented Dutton with a list of the violations and the corrective actions to cure them. Tulane also alleges that Failla counseled her concerning the infractions. In a written memorandum, Dutton later denied most of the violations raised by Failla. In October 2001, Dutton requested a second leave from October 15, 2001 to October 22, 2001, to undergo additional medical procedures arising from, she claims, complications from the first medical procedure. Dutton was permitted to take the second leave, despite the fact that neither Dutton, nor Tulane, designated those absences as FMLA leave.

On November 1, 2001, Failla reviewed Dutton's file and discovered that over 1,000 accounts had not been worked-up. Failla requested Dutton to work-up the accounts by November 9, 2001.

---

[1] The violations include the following: Dutton (1) was not adequately reviewing collectors' work and interacting with them, (2) was not properly monitoring collectors' phone usages, (3) was not requesting implant invoices timely, (4) had not developed cardiac stent invoicing procedures, (5) had apparently no lines of communication between herself and her staff, (6) had failed to deal with a substantial amount of urgent and un-worked correspondence in her office from insurance companies and others who owed money to Tulane, (7) had no organized filing system for confidential personnel information, (8) had an unorganized work area, and (9) had failed to implement and monitor certain procedures, thereby causing redundant work for her and her collectors.

When Failla reviewed those files on November 9, she found that over 1000 accounts still had not been worked-up. The district court determined the dollar amount of the accounts amounted to $556,732.04. Dutton was subsequently terminated on December 4, 2001.

As a result of her termination, Dutton filed suit in the United States District Court for the Eastern District of Louisiana, alleging that Tulane violated § 2601-2654 of the FMLA by retaliating against her for taking protected medical leave. Dutton specifically contended that Tulane retaliated against her by: (1) writing her up after her return from FMLA leave; (2) failing to restore her to the position she held prior to her leave; (3) holding her to a higher standard of performance after her return from leave; and (4) terminating her shortly after returning from her second FMLA leave. Dutton also alleged that Tulane violated her rights under the ADA by discriminating against her because of her disability.

The parties subsequently filed opposing motions for summary judgment. After the district court granted Tulane's motion for summary judgment, Dutton filed this timely appeal. Dutton's appellate claims essentially contend that the district court: (1) erred in granting Tulane's motion for summary judgment on her FMLA and ADA claims; and (2) abused its discretion under the ADA in awarding expert costs. Tulane's motion for attorney's fees pursuant to 42 U.S.C. §12205 of the ADA has been carried with the case.

## STANDARD OF REVIEW

We review de novo a district court's grant of a motion for summary judgment, applying the same standard as the district court did in the first instance. See Burge v. Parish of St. Tammany, 187 F.3d 452, 465 (5th Cir. 1999). Summary judgment is appropriate where the moving party establishes "there is no genuine issue of material fact and that [it] is entitled to judgment as a matter of law."

4

FED. R. CIV. P. 56(c). Accordingly, the moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden. Celotex v. Catrett, 477 U.S. 317, 327 (1986). The moving party "need not negate the elements of the nonmovants's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

Once the moving party has carried its summary judgment burden, the opposing party must set forth specific facts showing a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Wallace v. Texas Tech Univ., 80 F.3d 1042 (5th Cir. 1996). Allegations or affidavits setting forth merely conclusory facts and conclusions of law are insufficient. Galindo v. Precision American Corp., 754 F.2d 1212, 1216 (5th Cir 1985). Rather, the nonmovant is required to show more than some metaphysical doubt as to the material facts; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584-86 (1986), he or she must put forth "concrete and particular facts." Duffy v. Leading Edge Products, Inc., 44 F.3d 308, 312 (5th Cir. 1995).

## LAW

Section 2612(a)(1)(D) of the FMLA requires employers governed thereunder to provide eligible employees with up to twelve weeks unpaid leave if an employee has a "serious health condition," rendering that employee unable to perform the functions of his or her normal position. Manuel v. Westlake Polymers Corp., 66 F.3d 758, 761 (5th Cir. 1995). Once the employee returns from a qualified FMLA absence, the employer must return the employee to the same position or one comparable to that held before taking leave. 29 U.S.C. § 2612(a)(1); see also Chaffin v. Carter Co., Inc., 179 F.3d 316, 319 (5th Cir. 1999) (counseling that an employer may not "interfere with, restrain, or deny the exercise of . . . any right provided under" FMLA) (quoting from 29 U.S.C. §

5

2615(a)(2)).  Thus, FMLA employers are statutorily prescribed from penalizing employees for exercising rights provided under the statute.  29 U.S.C. § 2612(a)(1); Chaffin, 179 F.3d at 319.

A plaintiff seeking to establish a claim of discrimination or retaliation pursuant to 42 U.S.C. §12102(2) of the ADA must first establish that she has a "disability" by establishing that she has: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of her impairment; or (3) that she can "be regarded" as having an impairment. See Sharod v. American Airlines, 132 F.3d 1112, 1119 (5th Cir. 1998).  Thus, a plaintiff who is in fact not disabled, as is Dut ton, may establish a claim of discrimination or retaliation under the "regarded as" prong if: (1) she has no impairment at all but is regarded by the employer as having a "substantially limiting" impairment; or (2) she has an impairment which is not substantially limiting but which the employer perceives as constituting a "substantially limiting" impairment. See Peagram v. Honeywell, Inc., 363 F.3d 272, 287 (5 th Cir. 2004).  If a plaintiff can meet this burden, her claim is then assessed under the McDonnell Douglas standard for discrimination or retaliation claims discussed below.  Sharod, 132 F.3d at 1122.

To prevail on a claim that one's employer retaliated against her for exercising FMLA rights in a case with no direct evidence of retaliation, as in this case, a plaintiff must first establish a prima facie case of retaliation.  Id. at 320-21.  This court utilizes the familiar McDonnell Douglas burden shifting analysis to determine whether the plaintiff was retaliated against.  Id.; see also Hunt v. Rapides Healthcare System, L.L.C., 277 F.3d 757, 768 (5th Cir. 2001).  Therefore, a prima facie case of retaliation is demonstrated if the plaintiff establishes that:  (1) she engaged in activity protected under the FMLA; (2) her employer carried out conduct adverse to her employment; (3) and a causal connection exists between the protected activity taken and the adverse employment action conducted

6

by her employer. Hunt, 277 F.3d at 757; Chaffin, 179 F.3d at 319; see also Jaynes v. Pennzoil Co., 207 F.3d 296, 299 (5th Cir. 2000). "The causal link required by the third prong of the prima facie case does not rise to the level of a 'but for' standard. [Thus,] [t]he plaintiff 'need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case.'" Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002) (internal and external citations omitted). Notwithstanding, the plaintiff carries the burden of persuasion, and once a prima facie case is established, a presumption of retaliation arises. See, e.g., Pratt, 247 F.3d at 606.

After the presumption is raised, however, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for terminating the employee. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); Chaffin, 179 F.3d at 319-20. As this burden "is one of production, not persuasion, it can involve no credibility assessment." Reeves, 530 U.S. at 142; see also, Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004) (stating that "the employer need not prove that it was actually motivated by its proffered reason.") (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)). If the employer meets its burden, however, the presumption of retaliation is rebutted. Chaffin, 179 F.3d at 320. The burden of persuasion then shifts back to the plaintiff to demonstrate that her employer's articulated reason for terminating her was merely a pretext for unlawful retaliation. Id.

A plaintiff seeking to survive summary judgment at this juncture must point to some evidence establishing that the employer's proffered reasons are pretextual. Reeves, 530 U.S. at 143; Gee, 289 F.3d at 345. In some instances, proof of pretext alone will be sufficient to preclude summary judgment. Reeves, 530 U.S. at 143 (stating that "a plaintiff's prima facie case, combined with

7

sufficient evidence to find that the employer's asserted justification is false, <u>may permit</u> the trier of fact to conclude that the employer unlawfully discriminated") (emphasis supplied); <u>cf. Crawford v. Formosa Plastics Corp., La.</u>, 234 F.3d 899, 903 (5th Cir. 2000) (observing that it is "possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination"); <u>Walton v. Bisco Indus., Inc.</u>, 119 F.3d 368, 371 (5th Cir. 1997). Indeed, the Supreme Court has instructed that, "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was <u>discriminatory</u>." <u>Reeves</u>, 530 U.S. at 143 (emphasis supplied). <u>Reeves</u> suggests that whether a plaintiff can survive summary judgment must be decided on a case-by-case analysis, determinative of a number of factors, including, "the strength of the prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered." <u>Id.</u> at 148-49. The ultimate burden of persuasion lies "at all times with the plaintiff." <u>Id.</u> at 143.

## DISCUSSION

A. <u>FMLA Claim</u>

Dutton contends that she has propounded sufficient evidence to raise a genuine issue of material fact that Tulane terminated her because she took protected medical leave.[2] For this reason,

---

[2] For the same reasons given by the district court, we reject Dutton's contention that she was retaliated against by not being restored to the same or an equivalent position held prior to her FMLA leave. Indeed, Dutton's own deposition testimony contravenes her assertion:

Q.     As part of that reorganization, you lost supervision over the billers and just
                                                            (continued...)

8

she maintains that the district erred in granting Tulane's motion for summary judgment.

For the purpose of our analysis we assume (as did the district court) without deciding that Dutton established a prima facie case of discrimination. We proceed to examine Tulane's asserted reasons for terminating Dutton. Tulane proffers as its legitimate, non-retaliatory reasons for terminating Dutton, assertions that Dutton had poor work performances and failed to meet expectations in, among other areas, monitoring activities and accuracy of her work assignments. In support, Tulane proffers evidence that before, during, and after taking leave, Dutton exhibited repeated problems in her supervisory duties. Tulane provides evidence that as of December 6, 2000, Dutton had not instituted a procedure for her, or her staff, to collect stent invoices, and as a result,

---

[2](...continued)
> had supervision over the collectors; is that right?
>
> **A.     Correct.**
>
> Q.     Does that decision form any part of this lawsuit?
> **A.     No.**  (Dutton's depo., at 55)
>
> . . . .
>
> Q.     Other than your discharge from employment, were there any other incidents of retaliation that you can point to?
> **A.     Not that I can point to.**

We also reject Dutton's contention that she was retaliated against because Tulane issued her a letter of reprimand after her return from leave. As the district court properly noted, merely being written up by one's employer is not an adverse employment action because such conduct does not involve an employer's "ultimate decision." See Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997) (observing that ultimate acts involve "'conduct such as hiring, granting leave, discharging, promoting, and compensating'") (citation omitted) ; Thomas v. Tex. Dep't of Criminal Justice, 220 F.3d 389, 394 n.2 (5th Cir. 2000) (holding that "receiving formal discipline" is not an "ultimate employment decision"). For this reason, we only consider Dutton's claim that she was unlawfully terminated for exercising her FMLA rights.

9

Tulane was not reimbursed for some of those expenditures;[3] that in May 2001, problems were discovered from an internal audit regarding Dutton's performance with follow-ups in collections; that in January 2002, Failla documented other problems with Dutton's performances, specifically with regard to: "(1) Dutton's use of her productivity reports, (2) her inadequate interaction bi-weekly with collectors [, i.e., her staff] , (3) her practice of putting herself up above her collectors, (4) her failure to work enough hours, and (5) her absence from the department when her collectors were working."[4] Tulane also points to evidence demonstrating that in April 2001, approximately two months prior to Dutton's first leave, Dutton received a poor performance evaluation, and that it was Dutton's lowest overall score during her employment at Tulane. As a result of the low performance score, Dutton's supervisor, Faillia, suggested, inter alia, that Dutton work on her communications skills with her staff. Finally, Tulane highlights the list of serious deficiencies discovered by the ARS employees delineated, supra. We find that these reasons, if accepted as true by a factfinder, are sufficient to rebut Dutton's presumption of retaliation. Stated differently, the record evidence is sufficient to find that Tulane's proffered reasons are not incredible as a basis for its decision to terminate Dutton.

Thus, the question becomes whether Dutton has proffered substantial probative evidence that Tulane's reasons for discharging her were false. This tasks entails discerning whether the evidence propounded by Dutton is sufficient for a reasonable factfinder to conclude that Tulane's proffered reasons for discharging Dutton are mendacious. See Laxton v. Gap, Inc., 333 F.3d 572, 579 (5th Cir.

---

[3] Stents are cardiac implant devices used during surgery. One of Dutton's responsibilities included collecting information regarding stents placed in patients, e.g., the manufacturer's invoice number of the stent, from the patient's cardiologist in order for Tulane to be reimbursed by that patient's insurer for the cost of the stent.

[4] Dutton states in her deposition that she recalls discussing some of these issues with Failla, specifically with regard to the productivity of her collectors.

2003).

In support of Dutton's contention that she was discharged because she took FMLA leave, Dutton asserts a host of arguments. Dutton first contends that, but for taking leave, Tulane would not have fired her. She asserts that the real reason she was terminated is because her file tracks had ballooned from 100 to over 1,000, while she was on leave. She also states that the increase was a natural result of her being out on medical leave, and suggests that the responsibility of attending to her accounts while on leave was left to Failla.

Dutton next contends that contrary to Tulane's contentions, her performance score of two on the formal performance evaluation does not reflect that she was deficient, but instead demonstrates that her performance consistently met expectations, but did not exceed expectations. She suggests that a reasonable factfinder could infer from the typewritten note listing her alleged infractions that Failla presented to her is not credible because the listed discrepancies were not presented in her formal evaluation. She also states that Failla's enumerated discrepancies were typewritten on an informal document instead of the formal document required under Tulane's policy. Dutton further contends that a factfinder could infer that Failla is not credible because the comments written by Failla on her formal evaluation were identical to comments Failla wrote on the evaluations of five of her supervisory counterparts in different departments.

Next, Dutton contends that the informal typewritten complaints of her performance are contradicted by the findings that ensued from the internal audit. Dutton states that the audit's report conversely indicates that she was outperforming her supervisory counterparts working in the governmental section of the BSO. Dutton contends that the audit's report is further proof that the list of discrepancies presented to her by Failla is not credible since Failla's allegations are directly

11

contradicted by the findings in the audit.

Finally, Dutton contends that she has established a genuine issue of material fact as to Failla's informal list of discrepancies because, after she was presented with the list from Failla, she filed a response rebutting every infraction alleged by her supervisor.

Based on the foregoing, the district court concluded that Dutton presented sufficient evidence to raise a genuine issue of material fact regarding whether Tulane's reasons for terminating Dutton were untrue. The court nonetheless concluded that Dutton failed to present competent summary judgment evidence sufficient to create a reasonable inference that Tulane fired her because she exercised her rights under FMLA. We agree with both of the court's assessments.

As the district court noted, Dutton puts forth competing contentious assertions concerning whether she indeed had poor work performances and continually failed to meet Failla's work expectations. But see Little v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991) (stating that "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification"). Dutton's problem, however, is a failure of proof. Thus, Tulane's summary judgment results from Dutton's failure to meet the summary judgment standard. See Clark v. America's Favorite Chicken Co., 110 F.3d 295, 297 (5th Cir. 1997) (directing that "[unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment"). Dutton's rebuttal lies in naked assertions, unsubstantiated by the record. Hence, she does not marshal sufficient objective evidence to allow for a reasonable inference that Tulane was motivated by retaliation. For example, she produces no counter-reports, aside from her self-serving

12

written denial of the ARS employees' findings, to rebut Tulane's third-party's report listing a host of workplace failures by her. She produces no affidavits or deposition testimony from other supervisors or credible employees attesting to the fact that the ARS employee's report was inaccurate or false. There is no actual proof that Failla was indeed responsible for her accounts while she was out on leave, and no proof to sufficiently rebut Tulane's assertion that she neglected to open weeks worth of incoming mail.

Oddly, Dutton's inability to rebut her employer's proffered business reasons for terminating her is further hindered by her own deposition testimony. Indeed, plaintiff's deposition testimony acts to suck the remaining air propelling her claim, completely out of her sails. We highlight just some of her deposition testimony to make our point:

Q.    Were you receptive to their [the ARS employees] efforts to help out?

A.    **I became receptive, yes.**  (Dutton's depo., at 85);

Q.    Okay.  Item 2 [of the ARS report] mentions a productivity report. . . .

         . . . .

Q.    Do you recall her [Failla] saying anything that indicated to you a concern on Mary's part that the collectors could have been more productive than they actually were?
A.    **Yes.**  (Dutton's depo., at 100-02);

Q.    Were you aware that an internal audit had occurred before I produced this document to you in the lawsuit?
A.    **Yes.**

         . . . .

Q.    It [the internal audit report] says, 'Collection follow-up should be monitored more closely to help ensure adequate follow-up is performed timely based on established collection philosophies." Do you see that?
A.    **Yes.**

Q.    Prior to getting a copy of this document from me, were you aware that the internal auditors found collection follow-up to be a major issue as part of their audit?

A.    **Yes.**  (Dutton's depo., at 102-03);

Q.    What I'm asking is: Part of what needed to be done to improve the follow-up would have been to communicate your expectations to your collectors, but part of that, also, was you actually, effectively, monitoring their activities; is that right?

A.    **Right.**  (Dutton's depo., at 102-03)

We think some of the most damning testimony has to do with statements of how Dutton rated her own performance in a particular area:

Q.    Take a look at item 5 [of the formal evaluation], 'Monitors activities and work assignments for accuracy, timeliness, in compliance with department standards.'  Do you see that?

A.    **Yes.**

Q.    Okay.  Now, you rated yourself a one, 'Does not meet [expectations]'; is that right?

A.    **Yes.**  (Dutton's depo., at 108)

After careful review of the entire record, we are sufficiently persuaded that Dutton has failed to provide evidence sufficient for a reasonable factfinder to infer, by a preponderance of the evidence, that Tulane discharged her--because she exercised her rights under the FMLA.

B.  ADA Claim

We pretermit an analysis of the timeliness of Dutton's ADA claim and proceed to the merits and conclude as the district court that she failed to establish a "disability" under the Americans With Disability Act.  The only element that was at issue in establishing that she had a disability was the

14

"regarded as" prong. See Sharod, 132 F.3d at 1122. The district court concluded that Dutton produced no evidence to raise a genuine issue of material fact that she was ever "regarded as" disabled by Tulane. We have carefully reviewed this record and similarly find that there is no evidence to create a genuine issue of material fact that Tulane ever regarded Dutton as disabled. Accordingly, this claim is without merit.

    C. Attorney's Fees

Finally, Tulane contends, pursuant to Fifth Circuit Rule 47.8, that it is entitled to an award of a portion of the attorney's fees it incurred in defending Dutton's claims under the ADA and the FMLA because Dutton's claims were frivolous. After dismissing all of Dutton's claims with prejudice, the district court awarded Tulane $21,787.50 in attorney's fees it incurred in defending Dutton's claims under the ADA. Section 12205 of Title 42 of the United States Code allows a court to award the defending party of an ADA action, "reasonable attorney's fees, including litigation expenses and costs," if the court finds the plaintiff's claim was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. V. EEOC, 434 U.S. 412, 421 (1978). See also EEOC v. First Alabama Bank, N.A., 595 F.2d 1050, 1056 (5 th Cir. 1979). The district court noted that Dutton failed to dismiss the claim after Tulane suggested to her it had no merit. We have reviewed Dutton's contentions in her brief suggesting that her ADA claim had merit because Tulane offered to settle that claim. Again, Dutton's own deposition testimony cited above acts as her Achilles heel.

Because Dutton virtually admits she had no ADA claim, we do not consider the district court's denial of her request for equitable tolling. After full review of the record, we cannot find that the district court abused its discretion in awarding Tulane attorney's fees pursuant to §12205 of the

ADA. See No Barriers, Inc. v. Brinker Chili's Tx., Inc., 262 F.3d 496, 498 (5th Cir. 2001) (directing that this court reviews a district court's award of attorney's fees for an abuse of discretion). Accordingly, the district court's award of attorney's fees to Tulane in the amount of $21,787.50 was not an abuse of discretion. Also, carried with the case is Tulane's motion for additional attorney's fees in the amount of $12,443.12. We award $10,000 as reasonable attorney's fees for this appeal. Costs are assessed against the appellant, Dutton.

## CONCLUSION

Because Dutton does not present sufficient evidence to allow for a reasonable inference that Tulane terminated her because she took protected medical leave, she has failed to meet her summary judgment burden of proving a genuine issue of material fact concerning her FMLA claim. For this reason, and all the reasons stated herein, the order of summary judgment by the district court dismissing Dutton's claims with prejudice and awarding Tulane attorney's fees is AFFIRMED. Tulane's motion for additional attorney's fees is GRANTED.

SUMMARY JUDGMENT AND ATTORNEY'S FEE AWARD AFFIRMED AND MOTION FOR ADDITIONAL ATTORNEY'S FEES GRANTED IN PART.